UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


WILLIAM BARKELEY,

        Plaintiff,

                                        File No.  1:07-CV-1008

v.

                                        HON. ROBERT HOLMES BELL

STEELCASE, INC., a Michigan
corporation,

        Defendant.

_____/


**O P I N I O N**

      This disability discrimination and retaliation case is before the Court on the defendant employer's motion for partial summary judgment on the issue of disability and for summary judgment on the issues of discrimination and retaliation.  (Dkt. Nos. 41, 51.)  For the reasons that follow, the Court will deny Defendant's motion for partial summary judgment on the issue of disability and grant Defendant's motion for summary judgment on the issues of discrimination and retaliation.

**I.**

      Defendant Steelcase, Inc. ("Steelcase") is a Michigan corporation engaged in the business of office furniture design, manufacture, and sale.  Plaintiff William Barkeley has been employed by Steelcase since 1984.  At the time he filed this action, Barkeley held the position of director of marketing.

Barkeley has Usher's Syndrome Type II, a disease involving progressive hearing and vision loss. (Barkeley Dep. 303.) His hearing loss began in childhood and his vision loss began in his late twenties. Barkeley has 20/20 vision in the center of his eye, but he only has 15 degrees of peripheral vision. His condition has been relatively stable over the last several years.

In early 2000 Barkeley was the national sales manager for Steelcase Design Partnership ("SDP"), the umbrella organization for three independently-run higher-end furniture companies (Brayton, Metro, and Vecta). (Barkeley Dep. 8-9.) In May 2000 Michael Love was promoted from his position as president of Vecta to the position of president of SDP. (*Id.* at 27.) Shortly after assuming this position, Love promoted Barkeley to the position of director of marketing and sales for SDP. (*Id.* at 32.) Roger Schlick, who had prior experience at another company, was hired to fill Barkeley's former position as national sales manager for SDP. (*Id.* at 52.) In 2004 Schlick moved to the position of co-vice president of sales at Brayton, one of the individual companies. (*Id.* at 61, 72.) Barkeley did not perceive Schlick's move to be a promotion or an increase in responsibility. (*Id.* at 76.)

In 2005, Steelcase initiated Project Ryan, a project aimed at creating a fully-integrated SDP sales force. Both Barkeley and Schlick were on the Project Ryan team. The Project Ryan team recommended a reorganized SDP sales model and sales force and the creation of a new position, SDP vice president of sales. Barkeley had expressed his desire for the new

SDP vice president of sales position, but in April 2006 Mike Love selected Schlick for the position. (*Id.* at 102, 127-28, 134-35, 147.) The reorganization resulted in the elimination of twenty-five positions, including sales management positions in the individual companies. (*Id.* at 105-07.) Barkeley lost his sales responsibilities as a result of the reorganization, but he did not lose his job. He continued in his position as SDP director of marketing and in the work he was doing for Frank Merlotti, Jr. on the Brand 3 project, a project directed at creating a new premium band. (*Id.* at 114-17.)

On July 18, 2006, Barkeley filed a charge of discrimination with the Michigan Department of Civil Rights ("MDCR")/Equal Employment Opportunity Commission ("EEOC"), contending that Steelcase failed to promote him to the position of SDP vice president of sales because he has a disability. (Dkt. No. 5, Answer ¶ 5).

Steelcase underwent another reorganization in October 2006 with the creation of the new Brand 3 organization. Merlotti was President of the Brand 3 Group. In February 2007 Barkeley desired, but was not selected for, the Brand 3 vice president of marketing position. Merlotti selected Jason Heredia instead. Barkeley retained his position of director of marketing; he has suffered no reduction in pay or benefits, but he now reports to Heredia rather than directly to Merlotti, and his duties have been reduced. (Barkeley Dep. 272.)

On February 27, 2007, Barkeley filed a second charge of discrimination with the EEOC contending that Steelcase failed to promote him to the position of vice president of

marketing because he has a disability and in retaliation for filing a charge of discrimination with the MDCR/EEOC.  (Answer ¶ 6).

Barkeley withdrew his EEOC charges and filed this action alleging that he was denied promotional opportunities as a result of his disability and that he was retaliated against with respect to the second promotion for filing a charge of discrimination with the EEOC. Steelcase has filed (1) a motion for partial summary judgment on the basis that Barkeley does not have a disability, and (2) a motion for summary judgment on the basis that Steelcase did not discriminate in its selections for the two vice president positions.

## II.

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  In evaluating a motion for summary judgment the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  If Defendant carries its burden of showing there is an absence of evidence to support a claim then Plaintiff must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986).

In considering a motion for summary judgment, the court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party.  *Minges Creek, L.L.C.*

*v. Royal Ins. Co. of Am.*, 442 F.3d 953, 955-56 (6th Cir. 2006) (citing *Matsushita*, 475 U.S. at 587). Nevertheless, the mere existence of a scintilla of evidence in support of Plaintiff's position is not sufficient to create a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The proper inquiry is whether the evidence is such that a reasonable jury could return a verdict for Plaintiff. *Id.*; *see generally Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476-80 (6th Cir. 1989).

## III.

Barkeley alleges that he was discriminated against on the basis of his disability in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA"), and the Michigan Persons with Disabilities Civil Rights Act, Mich. Comp. Laws § 37.1101, *et seq.* ("PWDCRA"). Steelcase has moved for partial summary judgment on the issue of disability. Steecase contends that Barkeley is not disabled within the meaning of either the ADA or the PWDCRA because he is not substantially limited in any major life activity.

The ADA defines "disability" to mean

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2).

The EEOC regulations define "substantially limits" to mean:

(i) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j).  "[M]ajor life activities" are "activities that are of central importance to daily life."  *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 197 (2002).  The EEOC regulations provide that "seeing" is a major life activity.  29 C.F.R. § 1630.2(i) ("Major Life Activities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.").

Factors to consider in determining whether an impairment substantially limits an individual's major life activities are "[t]he nature and severity of the impairment; [t]he duration or expected duration of the impairment; and [t]he permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment."  *Toyota*, 534 U.S. at 196 (quoting 29 C.F.R. §§ 1630.2(j)(2)(i)-(iii)).

"[T]he PWDCRA and the ADA are similar in purpose, and generally require similar proofs."  *Peden v. City of Detroit*, 680 N.W.2d 857, 871 (Mich. 2004).  Because of these similarities, Michigan courts look to federal cases interpreting the ADA when applying the PWDCRA.  *See Chmielewski v. Xermac, Inc.*, 580 NW2d 817 (Mich. 1998).  "In cases filed under both the ADA and the PWDCRA against employers subject to both acts, if an employer is found to have violated the ADA, rarely will it make any practical difference whether the employer has also violated the PWDCRA."  *Peden*, 680 N.W.2d at 870 n.22.

6

*See also Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 634 n.3 (6th Cir. 1998) ("Michigan handicap and employment discrimination law essentially tracks federal law.  Generally, resolution of the federal claims will also resolve Plaintiff's MHCRA claims.")

Under the ADA, the Court is required "to determine the existence of disabilities on a case-by-case basis." *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 566 (1999).  *See also Toyota*, 534 U.S. at 198 ("That the Act defines 'disability' 'with respect to an individual,' 42 U.S.C. § 12102(2), makes clear that Congress intended the existence of a disability to be determined in such a case-by-case manner.")  Thus, in *Albertson's* the Supreme Court has observed that although people with monocular vision "ordinarily" will meet the Act's definition of disability, the ADA "requires monocular individuals, like others claiming the Act's protection, to prove a disability by offering evidence that the extent of the limitation in terms of their own experience, as in loss of depth perception and visual field, is substantial."  527 U.S. at 567.

In response to Steelcase's motion for partial summary judgment on the issue of disability, Barkeley does not contend that he is disabled within the meaning of the ADA and the PWDCRA as a result of his hearing loss.  Neither does he contend that he is regarded as having a disability.  (Dkt. No.  58, Pl.'s Resp. to Mot. for Partial SJ.)  Instead, Barkeley asserts that he is disabled because he is substantially limited in the major life activity of seeing.

The facts regarding Barkeley's vision impairment are not in dispute.  Barkeley is legally blind with a restricted field of vision as a result of a permanent, irreversible, and

progressive physical condition.  His central vision is approximately 20/20,  but he has only

15 degrees of peripheral vision compared to a normal field of peripheral vision of 180

degrees.  As a result, Barkeley sees the world through a very restricted pinhole.   He has

tunnel vision and his ability to see decreases under low light conditions. (Barkeley Dep. 303-

04.)  Barkeley's vision is currently stable, but will continue to deteriorate over time.  (*Id.* at

305.)  There are no measures that would mitigate or correct his vision impairments.  (*Id.* at

307.)

When asked how his visual impairments impact his major life activities, Barkeley

responded that driving is the biggest thing he does not do.  (*Id.* at 313.)  Sometimes co-

workers may need to alert him to something he has not seen, and in low light conditions he

might grab someone's arm for help.  "Those are the major things.  It's really more about just

knowing when to ask for some assistance typically with navigation." (*Id.* at 312.) Other than

driving, Barkeley testified that he is able to participate in the major life activities.  (*Id.* at

313.)  His activities include advanced snow skiing and water skiing.  He summitted Mount

Kilimanjaro in 2007.  (*Id.* at 313-14.)  Barkeley engages in these activities with special

assistance from a guide and technological devices. (*Id.* at 313-15.)  None of his impairments

have impacted his ability to perform professionally at Steelcase.  (*Id.* at 315.)

Steelcase contends that Barkeley has not shown that his visual impairment

substantially limits his major life activities in any way.  Although Barkeley has presented

evidence that he cannot drive, the circuit courts that have considered the issue have uniformly

held that driving is not a "major life activity" for purposes of the ADA.  *See, e.g.*, *Eshelman*

*v. Agere Systems, Inc.*, 543 F.3d 426, 435 (3d Cir. 2009); *Kellogg v. Energy Safety Servs. Inc.*, 544 F.3d 1121, 1125 (10th Cir. 2008); *Chenoweth v. Hillsborough County*, 250 F.3d 1328, 1329-30 (11th Cir. 2001); *Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 643 (2d Cir. 1998).

Steelcase cites two cases in support of its contention that restricted peripheral vision does not constitute a disability under the ADA because it does not substantially limit a major life activity. In *Overturf v. Penn Ventilator, Co., Inc.* 929 F. Supp. 895 (E.D. Pa. 1996), the plaintiff testified at his deposition that he had developed a tumor behind his eye which caused him to have double and sometimes triple vision, but that he was able to compensate for this by adjusting his line of vision, that he had no peripheral vision, that he could drive a car, watch television, and read, and that his eye problem never interfered with his work. *Id.* at 898. The district court entered summary judgment for the defendant employer on the basis that, while the plaintiff's impairment substantially restricted him in certain ways, overall, his impairment did not substantially limit any major life activity, including his ability to see. *Id.*

In *Cline v. Fort Howard Corp.*, 963 F. Supp. 1075 (E.D. Okla. 1997), the plaintiff's visual impairment – nearsightedness and poor peripheral vision – affected her ability to operate a lift truck. *Id.* at 1080. However, the evidence revealed that she was otherwise able to perform activities requiring the use of her eyesight, including driving, participating in recreational activities, and performing all other tasks associated with employment. *Id.* at 1080-81. Based upon this evidence, the district court concluded that, while the plaintiff's

9

visual impairment restricted her ability to perform a specific task associated with her employment, it did not substantially limit the major life activity of seeing.  *Id.* at 1081.

Overturf and Cline are distinguishable from the case before this Court.  As noted in *Cline:*

> The common theme running through these cited cases is the recognition by the courts that a visual impairment which hinders, or makes it more difficult for an individual to function at a full visual capacity, does not amount to a substantial limitation on one's ability to see where the evidence suggests the individual can otherwise conduct activities requiring visual acuity.

963 F. Supp. at 1080.  Significantly, the plaintiffs in *Overturf* and *Cline* did not present evidence that they could not otherwise conduct activities requiring visual acuity.  Both of these plaintiffs could drive.  In contrast to the plaintiffs in *Overturf* and *Cline*, Barkeley has presented evidence that he cannot conduct some activities requiring visual acuity.  Specifically, he has presented evidence that he is legally blind and cannot drive at all.

As the Second Circuit noted in *Capobianco v. City of New York*, 422 F.3d 47 (2d Cir. 2005), although driving is not a major life activity, the major life activity at issue is the plaintiff's ability to see, and plaintiff's inability to drive at night or in dim light is relevant evidence of the extent of the limitations on his ability to see.  *Id.* at 58.  In *Capobianco*, the court held that a reasonable jury could find that the plaintiff's night blindness was a severe restriction or a substantial limitation on his ability to see.  The court accordingly held that there was a genuine issue for trial and reversed the district court's entry of summary judgment for the employer.  *Id.* at 59.

In *Cutrera v. Board of Supervisors of Louisiana State University*, 429 F.3d 108 (5th Cir. 2005), the Fifth Circuit reversed summary judgment for an employer based upon its determination that there was an issue of fact as to whether the plaintiff's macular degeneration was a disability. *Id.* at 111. The court held that the evidence that the plaintiff's vision was deteriorating from the inside out, that she retained some limited peripheral vision in her right eye, but was legally blind in her left eye, that she now believed that it would not be safe for her to drive, and that she had significant difficulty reading small type, handwriting, or any writing with poor contrast, was sufficient to create a genuine issue of fact as to whether was disabled under the ADA. *Id.* at 111-12.

In light of Barkeley's excellent central vision, his "can do" attitude, his willingness to ask for assistance, his willingness to experiment with new technological assistive devices, his high achievement at work, and his extraordinary recreational activities, it is difficult to regard him as disabled. It does not appear that Barkeley has allowed his vision impairment to substantially limit many of his major life activities. Nevertheless, there is also evidence that he has only 15 of the normal 180 degrees of peripheral vision, that the amount of light that enters into his field of vision is reduced by his tunnel vision, and that he cannot drive at all. These are all factors a jury could take into consideration in determining whether Barkeley's loss of visual field is substantial. Based upon the evidence of record, a reasonable jury could find that Barkeley substantially impaired in the major life activity of seeing. There is an issue of material fact as to whether Barkeley suffers from a disability within the terms

of the ADA and the PWDCRA. Accordingly, Steelcase's motion for summary judgment on the basis that Barkeley does not have a disability will be denied.

## IV.

Steelcase has also filed a motion for summary judgment on Barkeley's discrimination and retaliation claims. Steelcase contends that even if the Court assumes that Barkeley has a disability within the meaning of the ADA and the PWDCRA, Barkeley nevertheless cannot succeed on his discrimination and retaliation claims.

### A. Discrimination

Barkeley asserts that he was discriminated against on the basis of his disability when he was denied promotional opportunities for two positions for which he was eminently and uniquely qualified. In 2006 Barkeley was passed over for the SDP vice president of sales position. In February 2007 he was passed over for the Brand 3 vice president of marketing position.

Barkeley does not contend that he has any direct evidence of disability discrimination. Absent direct evidence of discrimination, his discrimination claims are subject to the burden shifting analysis described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008). Under this framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. A *prima facie* case of employment discrimination requires a plaintiff to show that: (1) he is a member of a protected class; (2) he was qualified for his job; (3) he suffered an adverse employment

12

action; and (4) he was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees.  *Id.*  If the plaintiff meets this burden, the burden shifts to the employer to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action.  If the employer does so, the burden shifts back to the plaintiff to show that the defendant's proffered reason was not its true reason, but merely a pretext for discrimination.  *Id.*

For purposes of this motion Steelcase does not challenge Barkeley's ability to establish a *prima facie* case of disability discrimination.  Steelcase nevertheless contends that it is entitled to summary judgment because it had legitimate non-discriminatory reasons for not selecting Barkeley for either of the two positions, and Barkeley cannot meet his burden of showing that Steelcase's proffered reasons were pretextual.

Steelcase contends that in both instances Barkeley was not promoted because another employee was better qualified.  Barkeley does not deny that Steelcase has articulated legitimate non-discriminatory reasons for its selections of Schlick and Heredia over Barkeley.  Barkeley contends, however that Steelcase's articulated reasons were pretextual.

The issue for the Court, then, is whether Barkeley has come forward with sufficient evidence from which a reasonable jury could infer that Steelcase's proffered explanations for its failure to promote Barkeley was merely a pretext for unlawful discrimination on the basis of Barkeley's disability.

Pretext may be established either directly by showing that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered

explanation is unworthy of credence.  *Burdine*, 450 U.S. at 256.  To create an issue of fact as to pretext, the plaintiff is required to present evidence to show that: (1) the proffered reasons had no basis in fact; (2) the proffered reasons did not actually motivate the decision; or (3) the proffered reasons were insufficient to motivate the decision.  *Gray v. Toshiba America Consumer Prods., Inc*., 263 F.3d 595, 600 (6th Cir. 2001).

The Sixth Circuit recently discussed the issue of pretext in a failure to promote case in *White v. Baxter Healthcare Corp.*, 533 F.3d 381 (6th Cir. 2008).  *White* clarified that there is no "business-judgment rule" that would require the court to defer to the employer's "reasonable business judgment" in Title VII cases.  *Id*. at 393 n.6.  *See also Smith v. Chrysler Corp*., 155 F.3d 799, 807 (6th Cir. 1998) ("Although courts should resist attempting to micro-manage the process used by employers in making their employment decisions, neither should they blindly assume that an employer's description of its reasons is honest.").  At the summary judgment stage the court's role is to determine whether the plaintiff has produced enough evidence to cast doubt upon the employer's explanation for its decision.  *White*, 533 F.3d at 393 n.6.  One way for a plaintiff to raise doubts about the lawfulness of the employer's business decision is by suggesting that the decision itself was unreasonable.  *Id*. *See also Wexler v. White's Fine Furniture, Inc*., 317 F.3d 564, 577 (6th Cir. 2003) ("[T]he reasonableness of a business decision is critical in determining whether the proffered judgment was the employer's actual motivation.").

The Court will review the evidence relating to the two promotions with this legal framework in mind.

**A.  SDP Vice President of Sales**

Steelcase presented evidence that Love selected Schlick rather than Barkeley for the SDP vice president of sales position because Schlick was the better candidate.  (Love Dep. 74-79.)  There is no dispute that Barkeley was also qualified for the position.  Love thought highly of Barkeley's abilities and promoted Barkeley from manager to director in 2000, gave Barkeley good reviews, nominated Barkeley for opportunities to expand his career within the company, and placed Barkeley among his three finalists for the vice president of sales position.  (Pl.'s Ex. 1, 2; Barkeley Dep. 32; Love Dep. 7, 13-14, 16-17, 89, 100-101.)

Love testified that Schlick, who had been co-vice president of sales at Brayton and had helped lead Project Ryan, was stronger-focused on "top line," that he had a greater understanding of the sales process and a greater understanding of what is necessary to generate sales, that he had more involvement with customers, dealers, and in-the-field sales, and that he had more of a sales-strategic thought process.  (Love Dep. 118.)  Love testified that when Schlick moved into the SDP national sales position previously occupied by Barkeley, there was a noticeable elevation and change in the job.  (*Id.* at 119.)  Love indicated that on the marketing side Barkeley is a great implementer and great on strategy, but that on the sales side Barkeley did not demonstrate ways to attack accounts and pricing.  Schlick, on the other hand, was stronger in formulating strategy on the sales side, and was better at making sales presentations.  (*Id.* at 124.)

Love acknowledged that, given Barkeley's responsibility for three brands, Barkeley's qualifications might surpass Schlick's qualifications in some respects.  However, Love

15

testified that Schlick had better skills on the product development side from being at Brayton and being involved in everything that took place within the company, including the product development meetings and the engineering projects. (*Id.* at 125.) Love also believed that, while Barkeley had good verbal and written skills, Schlick was stronger on the actual one-on-one communication. (*Id.* at 126.) Everyone in the top sales management of SDP believed that Schlick was a superior candidate over Barkeley for the SDP vice president of sales position. (Love Dec. ¶ 3; Chong Dec. ¶¶ 8-10; Zubor Dec. ¶¶ 9-11; Chapman Dec. ¶¶ 8-9; Witting Dec. ¶ 8.)

Barkeley contends that Steelcase's claim that Schlick was the better candidate was not reasonable or logical in light of the relative experience of Barkeley and Schlick. Barkeley notes that Schlick served on the management team of one independent company and had management experience with one product for two years, while Barkeley served on the executive team for the umbrella organization for all three independent companies, and had twenty years of experience selling and marketing all brands and leading the national sales organization.

In *White* the Sixth Circuit observed that evidence of White's "arguably superior qualifications" for the position, in and of itself, could lead a jury to doubt the justifications given for the decision not to promote him, and was therefore sufficient to create a genuine issue of material fact concerning the reasonableness of the employer's decision not to promote him. *White*, 533 F.3d at 394. Barkeley contends that he has similarly presented evidence that the depth and breadth of his experience was "arguably superior" to Schlick, and

that this was sufficient to allow the jury to determine "whether the employer's judgment was reasonable or was instead motivated by improper considerations." *Id*. at 393.

The Court does not agree with Barkeley's expansive reading of *White*. Contrary to Barkeley's suggestion, *White* does not call for a jury trial simply because the plaintiff has presented evidence that a reasonable employer **could have found** that the plaintiff was more qualified. As evidenced by the following quotation from *White*, a jury trial is called for when there is evidence that a reasonable employer **would have found** that the plaintiff was more qualified:

> If a factfinder can conclude that a reasonable employer **would have found** the plaintiff to be significantly better qualified for the job, but this employer did not, the factfinder can legitimately infer that the employer consciously selected a less-qualified candidate-something employers do not usually do, unless some other strong consideration, such as discrimination, enters into the picture.

*Id*. at 393-94 (emphasis added) (quoting *Aka v. Washington Hosp. Ctr*., 156 F.3d 1284, 1294 (D.C. Cir. 1998)). *White* does not leave the reasonableness of an employment decision to the unbridled discretion and second-guessing of a jury. In *White* the court articulated a number of factors that would enable a jury to disbelieve the employer's proffered explanations. *Id*. at 394-95. *White*, like the Sixth Circuit cases that preceded it, requires the plaintiff to come forward with some evidence that the employer's decision was disingenuous or unreasonable in order to show that it was pretextual. *See*, *e.g*., *Smith*, 155 F.3d at 807-08 ("When the employee is able to produce sufficient evidence to establish that the employer failed to make a reasonably informed and considered decision before taking its adverse employment action, thereby making its decisional process 'unworthy of credence,' then any reliance placed by

the employer in such a process cannot be said to be honestly held."); *Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1996) (noting that summary judgment is not available to an employer who offers the "business judgment" rationale where facts exist from which a reasonable jury could conclude that the employer's "business decision" was so lacking in merit as to call into question its genuineness); *In re Lewis*, 845 F.2d 624, 633 (6th Cir.1988) ("Sears does not have to establish that the basis on which it acted in firing Lewis was sound; rather, Lewis has the burden of demonstrating that Sears' stated reasons are pretextual. One way for Lewis to do this is to show that Sears' asserted business judgment was so ridden with error that defendant could not honestly have relied upon it.").

In this case Barkeley has not challenged the genuineness of Love's statements regarding Schlick's strengths, nor has he suggested that Schlick was not qualified for the SDP vice president of sales position. Barkeley has not suggested that the importance Love attached to Schlick's particular strengths was unreasonable or that it did not likely motivate his choice. Barkeley simply offers his own opinion that he was more qualified for the position than Schlick. Barkeley's evidence might be sufficient to show that a reasonable employer could have chosen him for promotion over Schlick, but he has not shown that it was unreasonable not to have chosen him. Barkeley has not shown that either Steelcase's assessment of Schlick's qualifications or the weight it attached to those qualifications was unreasonable. Barkeley has simply failed to come forward with a sufficient basis for questioning the credibility of Steelcase's articulated reasons for promoting Schlick rather than Barkeley.

Barkeley has also suggested that Steelcase's proffered reasons for promoting Schlick are not worthy of credence because Barkeley was not interviewed for the position and was never offered any explanation for his non-selection.

Failure to follow internal procedures can be evidence of pretext, particularly where it is shown that a company applied the same standard differently to people outside of the protected category. *See Durante v. Ohio Civil Rights Comm'n*, 902 F.2d 1568 (6th Cir.1990) (*per curiam*). Barkeley, however, has not shown that Love's failure to follow a formal interview process was against company policy, that it was unprecedented, or that it was even unusual. Nor has he shown that a formal interview process was called for in this case in light of the fact that there is no dispute that Love was well acquainted with all of the candidates for the position.

Viewing the evidence in the light most favorable to Barkeley, there is nothing to support an inference that Steelcase's stated reasons for promoting Schlick rather than Barkeley to the SDP vice president of sales position were a pretext for discrimination on the basis of Barkeley's disability. Steelcase is accordingly entitled to summary judgment on Barkeley's discrimination claim with respect to the SDP vice president of sales position.

**B.  Brand 3 Vice President of Marketing**

In 2006 Steelcase placed Merlotti in charge of establishing a new Steelcase organization to develop and take to the marketplace a new premium Steelcase brand as quickly as possible. (Merlotti Decl. ¶ 3.) Merlotti selected Heredia for the Brand 3 vice

19

president of marketing position in February 2007 because Heredia "was clearly the best candidate" for what he needed in that position.  (Merlotti Decl. ¶ 4.)

Merlotti had known Barkeley for over ten years and was acquainted with his work because Barkeley reported directly to Merlotti from October 2006 to March 2007.  (Merlotti Dep. 34, 36.)  Merlotti had a very positive impression of Barkeley and considered Barkeley to have high potential in the company.  (*Id.* at 35, 38.)  He approached Barkeley on one occasion to encourage him to apply for a general manager's position in the Steelcase seating division.  (Love Dep. 117; Merlotti Dep. 38-39.)

Merlotti testified that when he became president of Brand 3 he knew he wanted Bob Arco to serve as his creative director.  He then began considering who to hire as a marketing director who would report to the creative director.  (Merlotti Dep. 106, 118, 126-27.)  Barkeley was on a list of fifteen or so people Merlotti considered for the Brand 3 marketing position, but it quickly became clear to him that Heredia was the right fit for the job.  (*Id.* at 118, 121, 124, 140.)  Merlotti exposed Arco to Heredia, Barkeley, and others, to see how the chemistry developed.  (*Id.* at 121-22.)  Arco indicated that Heredia should be the head of marketing because he had skill sets that Arco did not feel he had.  (*Id.* at 106, 118.)  When Heredia indicated his reluctance to report to Arco, the position was changed to a vice president position reporting directly to Merlotti.  (*Id.* at 123, 126.)

Merlotti explained that Heredia had been in charge of a brand new start-up, store.Steelcase.com, to offer products over the web to consumers.  (*Id.* at 72.)  Heredia's work in getting the internet store up and running was "pretty outstanding" and internet sales

20

are anticipated to be a big part of Brand 3.  (*Id.* at 141-42.)  Merlotti's choice of Heredia was also influenced in part by Heredia's product development experience at Turnstone.  (*Id.* at 142.)  Heredia was a manager and then director of marketing at Turnstone, a part of Steelcase, for approximately four years.  During that time he was deeply involved in product development, strategic planning, budgeting, and new ventures.   (Malnor Decl. ¶ 3.) According to the president of Turnstone, Heredia is a "tremendous strategic thinker," his performance in the marketing role for Turnstone was "phenomenal," and he was considered by upper management to be a "rising superstar."  (*Id.* at ¶¶ 3, 5.)  In the summer of 2006 Merlotti and James Hackett, CEO of Steelcase, created a position for Heredia to keep him from accepting a position with a competitor of Steelcase.  (Def.'s Exs. E-J; Merlotti Dep. 77, 82-86, 91-94, 99-100; Heredia Dep. 33-34, 42.)

Barkeley has acknowledged that Heredia was qualified to fill the Brand 3 vice president of marketing position.  (Barkeley Dep. 279-280).  Barkeley nevertheless contends that, given his years of experience, his experience with premium brands, and the overall breadth and depth of his own experiences, that he was the better candidate.  (*Id.* at 275-81). Barkeley acknowledged that although he believed he was more qualified than Heredia, Heredia rose so quickly within the company that Barkeley did not know all of Heredia's qualifications.  (Barkeley Dep. 281.)

Barkeley does not claim to have the kind of product development or internet marketing experience that Heredia had.  Neither does he suggest that those experiences were not legitimate considerations in the selection process for the Brand 3 marketing position.

21

Neither does he contend that seniority trumps other qualifications in the selection process for a high level executive position.  Barkeley has failed to show that the difference between his and Heredia's qualifications raises an issue of fact as to the sincerity of Steelcase's stated reasons for choosing Heredia for the position.

Barkeley contends that another basis for doubting Steelcase's stated reasons is its changing rationale for selecting Heredia.  Barkeley contends that, although Steelcase now justifies its selection of Heredia based upon Heredia's marketing and product development track record, this is not the explanation Merlotti gave Barkeley.  Merlotti simply told Barkeley that Barekely had not been selected because he lacked leadership experience in the company.  (*Id.* at 270.)

It is well settled that "[a]n employer's changing rationale for making an adverse employment decision can be evidence of pretext."  *Asmo v. Keane, Inc.*, 471 F.3d 588, 596 (6th Cir. 2006) (quoting *Thurman v. Yellow Freight Systems, Inc.*, 90 F.3d 1160, 1167 (6th Cir. 1996)).  "When the justification for an adverse employment action changes during litigation, that inconsistency raises an issue whether the proffered reason truly motivated the defendants' decision." *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 592 (6th Cir. 2002). However, contrary to Barkeley's assertions, he has not come forward with evidence that Steelcase shifted its justifications for not promoting him to the Brand 3 vice president of marketing position.  Referencing Heredia's abilities and referencing Barkeley's lack of leadership strength are not inconsistent positions.  The reason Barkeley was not selected and the reason Heredia was selected are two sides of the same coin.  Barkeley has failed to show

that Steelcase engaged in shifting justifications that would raise an issue of fact as to Steelcase's true motivations for not promoting Barkeley to the position.

Viewing the evidence in the light most favorable to Barkeley, there is nothing to support an inference that Steelcase's stated reasons for promoting Heredia rather than Barkeley to the Brand 3 vice president of marketing position were a pretext for discrimination on the basis of Barkeley's disability. Steelcase is accordingly entitled to summary judgment on Barkeley's discrimination claim with respect to the Brand 3 vice president of marketing position.

## III. Retaliation

Barkeley also claims that he was denied the Brand 3 vice president of marketing position in retaliation for having filed a charge of discrimination with respect to the SDP vice president of sales position. Barkeley does not contend that he has any direct evidence of retaliation. In the absence of direct evidence, Barkeley's retaliation claim, like his discrimination claim, is governed by the *McDonnell Douglas* burden-shifting framework. *E.E.O.C. v. SunDance Rehab. Corp.*, 466 F.3d 490, 501 (6th Cir. 2006). To establish a *prima facie* case of retaliation in violation of the ADA, a plaintiff must demonstrate by a preponderance of the evidence that: (1) the employee engaged in protected activity; (2) the employer knew of the protected activity; (3) the employer thereafter took an adverse employment action; and (4) there is a causal connection between the protected activity and the adverse action. *Id*. Michigan courts applying Michigan discrimination statutes apply the same general framework. *See Sciotti v. 36th Dist. Court*, 758 N.W.2d 289, 290 (Mich. 2008).

However, the standard for causation under Michigan law is higher, requiring a showing that the protected activity was a "significant factor" in the employer's adverse employment action. *Barrett v. Kirtland Cmty. Coll.*, 628 N.W.2d 63, 70 (Mich. App. 2001).

There is no dispute that Barkeley engaged in protected activity when he filed the EEOC discrimination charge in July 2006, or that Merlotti knew that Barkeley had filed the EEOC charge before he selected Heredia to fill the Brand 3 vice president of marketing position in February 2007. (Merlotti Dep. 109.) There is also no dispute that a failure to promote can constitute an adverse action. *Thaddeus -X v. Blatter*, 175 F.3d 378, 396 (6th Cir. 1999). The issue raised by Steelcase in its motion for summary judgment is whether Barkeley has met the fourth element of his prima facie case, namely, causation.

"[A] causal connection for purposes of establishing a prima facie case of retaliation can be shown 'through knowledge [of the complaints] coupled with a closeness in time that creates an inference of causation.'" *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 550 (6th Cir. 2008) (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000)). In *Imwalle* the Sixth Circuit held that a period of less than three months between the EEOC discrimination complaint and termination supported an inference of causation. *Id*. at 550. However, in another case the Sixth Circuit held that a period of more than four months was too long to support an inference of causation. *Id.* (citing *Cooper v. City of N. Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986)).

At least six months elapsed between the time Barkeley filed his discrimination charge (July 2006) and the decision to select Heredia as the Brand 3 vice president for marketing

(February 2007).   Barkeley contends that, despite the lapse in time, he has adequately demonstrated the casual connection by establishing that Steelcase denied him a promotion at the first available opportunity after he filed his EEOC charge.  *See Enright v. Ill. State Police*, 19 F. Supp. 2d 884, 889 (N.D. Ill 1998) (holding that a two-year gap between the discrimination charge and the adverse employment action did not necessarily destroy the causal connection where a jury could find that the defendant did not have an opportunity to retaliate until the next round of promotions).

Assuming the six-month time period can be considered temporally proximate because there were no promotional opportunities in the interim, "'temporal proximity alone will not support an inference of retaliatory discrimination when there is no other compelling evidence.'"  *Imwalle*, 515 F.3d at 550 (quoting *Nguyen*, 229 F.3d at 566).

Barkeley contends that he has evidence of an earlier attempt at retaliation in April 2006 when Love attempted to remove certain job responsibilities from him.  (Pl.'s Resp. to Mot. for Summ. J. 22.)  This evidence cannot support the causation element of Barkeley's retaliation claim because it occurred prior to Barkeley's filing of his first EEOC charge in July 2006.  Barkeley has not produced any other evidence to support the causation element of his retaliation claim.  Accordingly, because he has failed to show causation, he has failed to establish a *prima facie* case of retaliation, and Steelcase is entitled to judgment on his retaliation claim.

Even if Barkeley were able to establish a prima facie showing of retaliation, Steelcase would nevertheless be entitled to summary judgment on this claim because Barkeley cannot

show that Steelcase's reason for selecting Heredia for the Brand 3 marketing position was a pretext for retaliation.  The decision not to hire Barkeley for the Brand 3 position was made by a different person (Merlotti) than the person Barkeley accused of discriminating against him with respect to the SDP position (Love).  Moreover, the evidence is undisputed that Merlotti had a high regard for Barkeley and that even after Barkeley filed the EEOC charge Barkeley was included among those Merlotti considered for the Brand 3 marketing position. (Merlotti Dep. 19, 118.)  Barkeley has not come forward with any evidence to suggest that Merlotti's decision to hire Heredia rather than Barkeley for the Brand 3 marketing position was motivated by a desire to retaliate against Barkeley for engaging in protected action.

Accordingly, for all the reasons stated, the Court will grant Steelcase's motion for summary judgment on all of Barkeley's claims.

An order and judgment consistent with this opinion will be entered.


Dated: March 17, 2009                              /s/ Robert Holmes Bell
                                                   ROBERT HOLMES BELL
                                                   UNITED STATES DISTRICT JUDGE